Kirk A. Pasich (SBN 94242)
KPasich@PasichLLP.com
Nathan M. Davis (SBN 287452)
NDavis@PasichLLP.com
Caitlin S. Oswald (SBN 330974)
COswald@PasichLLP.com
PASICH LLP
10880 Wilshire Blvd., Suite 2000
Los Angeles, CA 90024
Telephone: (424) 313-7860
Facsimile: (424) 313-7890

Michael S. Gehrt (SBN 246450)
MGehrt@PasichLLP.com
PASICH LLP
1230 Rosecrans Avenue, Suite 690
Manhattan Beach, CA 90266
Telephone: (424) 313-7860
Facsimile: (424) 313-7890

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED TALENT AGENCY, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>MARKEL AMERICAN INSURANCE COMPANY, a Virginia company; and DOES 1 through 10,<br><br>Defendants. | Case No. 2:21-cv-00369-MCS-E<br><br>Hon. Mark C. Scarsi<br><br>**OPPOSITION TO MARKEL'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: December 13, 2021<br>Time: 9:00 a.m.<br>Dept.: 7C<br><br>Complaint filed: December 18, 2020<br>Removal filed: January 14, 2021 |

# **TABLE OF CONTENTS**

**Page**

I. Introduction .......................................................................................... 1

II. Summary Judgment Standard ............................................................. 2

III. The Professional Services Exclusion Does Not Bar Coverage .......... 3

   A. The CAA Lawsuit Does Not Meet the Professional Services Exclusion's Plain Terms ............................................................... 3

      1. Markel Concedes That Professional Services Were Not Rendered ........... 4

      2. UTA Collected No Fee, Commission, or Other Compensation ................. 5

      3. The CAA Lawsuit Involved No Services Rendered to Others ................... 7

   B. Markel's Interpretation Must Be Rejected Because It Strays from the Exclusion's Language ............................. 7

   C. When The Exclusion's Words Are Heeded, Precedent Shows It Does Not Apply ............................................. 9

   D. Markel Cites No Supporting Case Law ......................................... 11

IV. California Insurance Code Section 533 Does Not Bar Coverage .................... 14

V. "Restitution"—In the Insurance Sense—Is Not at Issue Here ........................... 18

VI. UTA's Bad Faith Claim Should Move Forward ................................ 22

VII. Markel Fails to Address UTA's Declaratory Relief Claim ............................. 24

VIII. Markel Fails to Address UTA's Claims for Coverage for the Underlying Arbitrations ............................................... 24

IX. Conclusion ........................................................................................ 25

ii

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*AIG Prop. Cas. Co. v. Cosby*,
 892 F.3d 25 (1st Cir. 2018) (Souter, J.)...................................................9

*AIU Insurance Co. v. Superior Court*,
 51 Cal. 3d 807 (1990) ............................................................16, 21

*Albert J. Schiff Assocs., Inc. v. Flack*,
 417 N.E. 2d 84 (N.Y. 1980) ........................................................6, 7

*Ambrosio v. Brit UW Ltd.*,
 606 F. App'x 885 (9th Cir. 2015)......................................5, 9, 10, 11

*Ambrosio v. Certain Underwriters*,
 2012 WL 12540015 (N.D. Cal. Mar. 29, 2012) ..........................10, 11

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) .......................................................................2

*B & E Convalescent Ctr. v. State Comp. Ins. Fund*,
 8 Cal. App. 4th 78 (1992) ........................................................15, 17

*Bally v. State Farm Life Ins. Co.*,
 2021 WL 1668004 (N.D. Cal. Apr. 28, 2021)...................................7

*Bank of the West v. Superior Court*,
 2 Cal. 4th 1254 (1992) ..................................................................19

*Beazley Insurance Co., Inc. v. ACE American Insurance Co.*,
 880 F.3d 64 (2d Cir. 2018) ............................................................14

*Burlington Insurance Co. v. Bay One Security, Inc.*,
 2018 WL 1730425 (N.D. Cal. Apr. 10, 2018)..................................12

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ........................................................................3

*Dart Indus., Inc. v. Liberty Mut. Ins. Co.*,
 484 F.2d 1295 (9th Cir. 1973) .......................................................16

*Downey Venture v. LMI Ins. Co.*,
 66 Cal. App. 4th 478 (1998)......................................................15, 16

iii

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ............................................................. 2

*Egan v. Mut. of Omaha Ins. Co.*,
   24 Cal. 3d 809 (1979) ......................................................... 22

*Energy Insurance Mutual Ltd. v. ACE American Insurance Co.*,
   14 Cal. App. 5th 281 (2017) ......................................... 11, 12

*Exec. Risk Specialty Ins. Co. v. Rutter Hobbs & Davidoff Inc.*,
   2012 WL 12878754 (C.D. Cal. Sept. 12, 2012) .................... 16

*Fireman's Fund Ins. Co. v. Maryland Cas. Co.*,
   65 Cal. App. 4th 1279 (1998) ............................................. 12

*Food Pro Int'l, Inc. v. Farmers Ins. Exch.*,
   169 Cal. App. 4th 976 (2008) ............................................... 5

*Gray v. Zurich Ins. Co.*,
   65 Cal. 2d 263 (1966) ......................................................... 15

*Gruenberg v. Aetna Ins. Co.*,
   9 Cal. 3d 566 (1973) ........................................................... 22

*Hamilton v. Greenwich Investors XXVI, LLC*,
   195 Cal. App. 4th 1602 (2011) ........................................... 16

*Horace Mann Ins. Co. v. Barbara B.*,
   4 Cal. 4th 1076 (1993) ....................................................... 24

*HotChalk, Inc. v. Scottsdale Insurance Co.*,
   736 F. App'x 646 (9th Cir. 2018) .................................. 12, 13

*Howard v. Am. Nat'l Fire Ins. Co.*,
   187 Cal. App. 4th 498 (2010) ............................................. 23

*Jaffe v. Cranford Ins. Co.*,
   168 Cal. App. 3d 930 (1985) ............................................... 21

*Jamison v. Certain Underwriters*,
   599 F. App'x 720 (9th Cir. 2015) ............................... 9, 10 11

*People ex rel. Kennedy v. Beaumont Inv., Ltd.*,
   111 Cal. App. 4th 102 (2003) ............................................. 19

iv

PASICH

*Lee v. Luxottica Retail N. Am., Inc.*,
  65 Cal. App. 5th 793 (2021) ............................................................... 21

*Lippitt v. Raymond James Fin. Servs., Inc.*,
  340 F.3d 1033 (9th Cir. 2003) ............................................................ 16

*Lujan v. Gordon*,
  70 Cal. App. 3d 260 (1977) ................................................................ 16

*MacKinnon v. Truck Ins. Exch.*,
  31 Cal. 4th 635 (2003) ......................................................................... 6

*Massamont Ins. Agency, Inc. v. Utica Mut. Ins. Co.*,
  489 F.3d 71 (1st Cir. 2007) ............................................................. 6, 7

*Md. Cas. Co. v. Reeder*,
  221 Cal. App. 3d 961 (1990) ................................................................ 6

*Medill v. Westport Ins. Corp.*,
  143 Cal. App. 4th 819 (2006) ............................................................... 8

*Mosier v. S. Cal. Physicians Ins. Exch.*,
  63 Cal. App. 4th 1022 (1998) ............................................................. 16

*Mt. Hawley Ins. Co. v. Lopez*,
  215 Cal. App. 4th 1385 (2013) ........................................................... 23

*People ex rel. Kennedy v. Beaumont Inv., Ltd.,*,
  111 Cal. App. 4th 102, 134 (2003) ..................................................... 23

*Pac. W. Bank v. AIG Specialty Ins. Co.*,
  2021 WL 5238578 (C.D. Cal. Sept. 29, 2021) .............................. 9, 19

*Pan Pacific Retail Properties, Inc. v. Gulf Insurance Co*
  471 F.3d 961, 969 (9th Cir. 2006). ..................................................... 20

*Pardee Constr. Co. v. Ins. Co. of the W.*,
  77 Cal. App. 4th 1340 (2000) ............................................................... 9

*Reid v. Mercury Ins. Co.*,
  220 Cal. App. 4th 262 (2013) ....................................................... 23, 24

*Richardson v. Emp'rs Liab. Assurance Co.*,
  25 Cal. App. 3d 232 (1972) ................................................................ 22

**OPPOSITION TO MARKEL'S MOTION FOR SUMMARY JUDGMENT**

*Safeco Ins. Co. of Am. v. Robert S.*,
    26 Cal. 4th 758 (2001) ........................................................................ 4, 6

*Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*,
    78 Cal. App. 4th 847 (2000) ............................................................. 6, 24

*St. Paul Fire & Marine Ins. Co. v. Weiner*,
    606 F.2d 864 (9th Cir. 1979) ................................................................ 15

*State Farm General Insurance Co. v. Mintarsih*,
    175 Cal. App. 4th 274 (2009) ............................................................... 17

*Ticketmaster, LLC v. Ill. Union Ins. Co.*,
    524 F. App'x 329 (9th Cir. 2013) ........................................................... 7

*Unified Western Grocers, Inc. v. Twin City Fire Insurance Co.*,
    457 F.3d 1106 (9th Cir. 2006) ......................................................... 18, 20

*United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp.*,
    2012 WL 3861946 (S.D. Cal. Sept. 5, 2012) ....................................... 21

*Wilson v. 21st Century Ins. Co.*,
    42 Cal. 4th 713 (2007) .................................................................... 22, 24

**Statutes**

California Civil Code Section 1643 ............................................................ 6

California Insurance Code Section 790.03(h)(13) .................................... 22

California Regulations Code Section 2695.7 ...................................... 22, 23

Federal Rules of Civil Procedure 56(a) ..................................................... 2

PASICH₁₁₋

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**OPPOSITION TO MARKEL'S MOTION FOR SUMMARY JUDGMENT**

# I.     __Introduction__

Defendant Markel American Insurance Company seeks summary judgment based solely on two items: the insurance policy it sold to United Talent Agency ("UTA") and the Second Amended Complaint that UTA's competitor, Creative Artists Agency ("CAA"), filed in the Los Angeles Superior Court after several talent agents left CAA and began working for UTA (the "CAA Lawsuit"). Based on incomplete facts and incomplete statements of the law, Markel asks this Court to connect the dots on Markel's behalf to "see for itself" why Markel should be entitled to deprive UTA of its day in court via summary judgment. Markel's motion should be denied for several reasons.

*First*, Markel's reliance on the Policy's Professional Services Exclusion is flawed. Contrary to the law governing insurance policy interpretation and to the decisions that have examined the exclusion's language, Markel asserts an overly broad construction that deviates from the words Markel used in the exclusion and that would impermissibly expand the exclusion's scope to swallow up all of the Policy's coverage.

*Second*, Markel makes a bare-bones argument, deceptive in its simplicity, to the effect that California Insurance Code section 533 bars UTA's claims for coverage. In doing so, Markel asks this Court to ignore decades of binding precedent that requires insurers to pay for defense costs, regardless of the ultimate outcome of the litigation for which coverage is sought. Markel's position further contradicts its own Policy's requirement that it pay for defense costs until a non-appealable adjudication shows that UTA's claims are, in fact, uninsurable. No tribunal ever rendered such a decision.

*Third*, Markel seeks to avoid its duties by claiming that the relief that CAA sought from UTA was restitutive in nature and that California law prohibits insurance for restitution awards. However, CAA's claims do not fall within the category of "restitution," as that word has been interpreted in the insurance context.

Because CAA sought compensation for an expectancy to which it held no legal interest—future profits—that relief is "damages" (not "restitution") for insurance purposes.

*Fourth*, Markel hopes to avoid UTA's bad faith claim by relying on its breach-of-contract arguments and also baldly asserting that its coverage denial was reasonable based on its self-serving interpretation of the law. This argument fails, however, because bad faith claims can exist independently of breach-of-contract claims, and there is ample evidence that Markel failed to execute its duties to handle UTA's claim fairly and that it acted in a manner inconsistent with insurance industry customs, standards, and practices.

*Fifth*, Markel does not even address UTA's claim for declaratory relief, thus failing to make any effort—let alone to carry its heavy burden—to show entitlement to summary judgment.

*Sixth*, Markel's reliance solely on the Policy and CAA's Second Amended Complaint in the CAA Lawsuit ignores three other arbitration proceedings that made up the rest of the dispute between CAA and UTA (the "Underlying Actions"). Markel cannot be entitled to summary judgment on all of UTA's claims when it does not even address the totality of those claims.

For each of these reasons, Markel's motion must be denied.

## II.   Summary Judgment Standard

In deciding Markel's motion, all reasonable inferences from the evidence must be drawn in favor of UTA. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992) (non-movant's "version of any disputed issue of fact thus is presumed correct"). Markel cannot prevail unless it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To do so, Markel must demonstrate that no genuine issue exists as to any material fact and must demonstrate an absence of evidence to support UTA's

1 claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). Markel falls well
2 short of meeting its high burden.

3 **III.   The Professional Services Exclusion Does Not Bar Coverage**

4 Markel's motion must be denied because it fails to address the language that
5 Markel actually used in crafting the Professional Services Exclusion. That exclusion
6 states that Markel

7 shall not be liable to pay any Loss on account of, and shall
8 not be obligated to defend, any Claim based upon, arising
9 out of, or in any way involving any actual or alleged error,
10 misstatement, misleading statement, act, omission,
11 neglect, or breach of duty in connection with the rendering
12 or failure to render any professional services to others for
13 a fee, commission or other compensation by any Insured.

14 SGDMF No. 2.[1] Markel instead focuses on cases that interpret other exclusions that
15 are worded differently—and more broadly—than the exclusion that Markel wrote.
16 For the reasons discussed below, Markel's denial of coverage based on this
17 exclusion was wrong, and Markel's motion should be denied.

18 **A.      The CAA Lawsuit Does Not Meet the Professional Services**
19 **Exclusion's Plain Terms**

20 Markel argues that "other courts have interpreted broad professional liability
21 exclusions like the one at issue here very expansively and enforced them to preclude
22 coverage for Claims . . . which flow from or have anything to do with the Insureds'
23 Professional Services." MSJ at 11. As discussed in greater detail below, the
24 exclusion's language does not address claims "which flow from or have anything to
25 do with" professional services. If that is what Markel meant to say, it could (and
26 should) have done so. Courts "are not to insert what [an insurer] has . . . omitted. To

27
28 ---
[1] "SGDMF" refers to UTA's Statement of Genuine Disputes of Material Facts, filed
concurrently with this Opposition.

1  do so would violate the fundamental principle that in interpreting contracts,

2  including insurance contracts, courts are not to insert what has been omitted."

3  *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 764 (2001).

4      Markel takes this "very expansive[]" argument several steps further still in

5  addressing the fact that the Professional Services Exclusion only applies when UTA

6  commits alleged wrongful acts "*in connection with* rendering or failing to render any

7  *professional services  to others  for a fee, commission or other compensation* . . . ."

8  SGDMF No. 2 (emphasis and underscoring added). Thus, there are three

9  components that all must be present for this exclusion to apply: (i) *Were*

10 *professional services rendered?*, (ii) *To whom were they rendered?*, and (iii) *Did*

11 *UTA collect a fee, commission or other compensation from rendering them?*

12     Markel asks this Court to skip this analysis, arguing, "[t]he *sine qua non*, the

13 entire rationale of, and motivation for, the alleged scheme to steal CAA agents and

14 clients, was the monetary value to UTA of the professional services UTA *would*

15 render . . . ." MSJ at 13 (emphasis added). In other words, because recruiting agents

16 and clients to come to UTA "*would*" eventually result in the rendering of

17 professional services to clients, the exclusion applies. Markel is wrong.

18     1.   Markel Concedes That Professional Services Were Not Rendered

19     Markel states that the reason for recruiting agents from CAA "was the

20 monetary value to UTA of the professional services UTA *would* render . . . ." This

21 usage of "would" is an auxiliary function "to express a plan or intention" or a "wish,

22 desire, or intent." *Would*, Merriam-Webster.com/dictionary/would. Accordingly, by

23 its own argument, Markel acknowledges that the alleged acts giving rise to the CAA

24 Lawsuit were not professional services, but rather were taken with the future intent

25 to render professional services. Because professional services were not yet rendered,

26 but merely contemplated, the exclusion does not apply.

27     Furthermore, just because future professional services were contemplated

28 does not mean that the alleged wrongful acts were committed "in connection with"

4

PASICH

the rendering of those services. As UTA discusses in its motion for partial summary judgment, California law construes professional services exclusions narrowly, and courts across the country refuse to apply them unless the wrongful acts were committed as part of the professional services being rendered. *See* ECF No. 36-1 at pp. 14-19. Even if an insured committed wrongful acts while they were supposed to be providing professional services, unless the wrongful acts relate to the "adequacy of [the insured's] performance of professional services to its client," the exclusion does not apply. *Food Pro Int'l, Inc. v. Farmers Ins. Exch.*, 169 Cal. App. 4th 976, 990 (2008); *accord Ambrosio v. Brit UW Ltd.*, 606 F. App'x 885, 887 (9th Cir. 2015) ("the existence of *some* connection was insufficient to establish that the claim in *Food Pro* was excluded").[2]

Markel's acknowledgement that the acts alleged in the CAA Lawsuit "*would*" eventually lead to professional services shows that they are not, in fact, professional services. Thus, the Professional Services Exclusion does not bar UTA's claims.

2.   UTA Collected No Fee, Commission, or Other Compensation

Markel does not and cannot plausibly argue that UTA recruited agents "for a fee, commission, or other compensation." Instead, Markel argues that recruiting agents was motivated by the desire to increase UTA's profitability, so the exclusion should apply. MSJ at 14. Were Markel's argument adopted, nothing would escape the Professional Services Exclusion's maw. If everything that UTA does in pursuit of profit is automatically considered done "in connection with" rendering professional services, then what would fall outside of Markel's reading of the Professional Services Exclusion? Like most large companies, UTA leases office space, hires support staff, purchases office supplies and equipment, and does a litany

---

[2] As discussed in greater detail below, in *Food Pro*, the professional services exclusion contained broader wording that Markel appears now to wish it had put in its own Policy.  Still, the court held it did not apply. *See Food Pro*, 169 Cal. App. 4th at 981 ("arising out of the rendering or failure to render any professional services").

of other activities whose ultimate aim is to increase profitability. That does not mean that each of those activities is done "in connection with" professional services. As the New York Court of Appeals explained when interpreting the scope of an errors-and-omissions policy:

> The renting of an office, the engagement of employees, arrangements to expand the size of one's activities, these may all have some connection with a covered business or profession. But, while they may set the stage for the performance of business or professional services, they are not the professional activities contemplated by this special coverage. An errors and omissions policy is intended to insure a member of a designated calling against liability arising out of the mistakes inherent in the practice of that particular profession or business.

*Albert J. Schiff Assocs., Inc. v. Flack*, 417 N.E. 2d 84, 88 (N.Y. 1980); *see also Massamont Ins. Agency, Inc. v. Utica Mut. Ins. Co.*, 489 F.3d 71, 74 (1st Cir. 2007) ("business decision[s]" "like leasing a building, buying supplies or charging for services" are not "professional services").

UTA is a business whose purpose is to generate profits, and scarcely anything it does is entirely unrelated to that purpose. Markel's proposed construction of the Professional Services Exclusion would sweep at least as broadly as the coverage grant. California law prohibits such an interpretation. Cal. Civ. Code § 1643 (contracts must be construed in a manner to give them effect); *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 645-46 (2003) (refusing to enforce an exclusion in a way that would create absurd results); *Safeco*, 26 Cal. 4th at 765 (refusing to enforce an exclusion to render coverage "illusory"); *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 868 (2000) (refusing to apply exclusions in a manner that would nullify coverage); *Md. Cas. Co. v. Reeder*, 221 Cal. App. 3d

6

1  961, 978 (1990) (courts must "avoid a construction under which a contracting party
2  receives no benefit from a contract").

3      Even the broader language that Markel seems to wish it had put into its
4  exclusion (discussed further below) must be construed narrowly to avoid vitiating
5  coverage, which is contrary to Markel's proposed construction. *See Ticketmaster,*
6  *LLC v. Ill. Union Ins. Co.*, 524 F. App'x 329, 330-31 (9th Cir. 2013) (subjecting
7  exclusion's "arising out of" language to "closest possible scrutiny" and adopting the
8  reasonable interpretation that granted coverage over one that did not).

9              3.      The CAA Lawsuit Involved No Services Rendered to Others

10     In the same way that the CAA Lawsuit arose from conduct that merely
11  contemplated future professional services, that conduct was not undertaken on
12  anyone's behalf or for anyone's benefit, other than UTA's and the agents it sought
13  to employ. UTA's hiring decisions are for itself, not "for others," as the Professional
14  Services Exclusion requires. *See Albert*, 417 N.E. 2d at 88; *cf. Massamont*, 489 F.3d
15  at 74.

16  **B.     Markel's Interpretation Must Be Rejected Because It Strays from**
17  **the Exclusion's Language**

18     Markel primarily argues that the CAA Lawsuit falls within the Professional
19  Services Exclusion because UTA's claim "aris[es] out of" "professional services."
20  This is incorrect. The exclusion applies only to claims that "arise out of" *behavior*
21  "*in connection with*" "professional services." That may sound technical, but
22  "[w]ords matter, and [Markel] is the party that chose the words." *Bally v. State*
23  *Farm Life Ins. Co.*, 2021 WL 1668004, at *9 (N.D. Cal. Apr. 28, 2021) (denying
24  insurer's motion for summary judgment on breach of contract claim).

25     The Professional Services Exclusion's relevant portion reads as follows:

26              [A]ny Claim based upon, arising out of, or in any way
27              involving any actual or alleged error, misstatement,
28              misleading statement, act, omission, neglect, or breach of

7

PASICH

1    duty in connection with the rendering or failure to render

2    any professional services . . . .

3  SGDMF No. 2. Grammatically speaking, the Professional Services Exclusion

4  contains five structural components: three are nounal (yellow below), and two are

5  prepositional (blue below):

6    [A]ny Claim

7    based upon, arising out of, or in any way involving

8    any actual or alleged error, misstatement, misleading

9    statement, act, omission, neglect, or breach of duty

10   in connection with

11   the rendering or failure to render any professional

12   services . . . .

13  Because prepositions describe relationships between nouns, it is apparent that

14  "arising out of" does not apply to "the rendering or failure to render any professional

15  services." "[A]rising out of" describes the relationship between "any Claim" and the

16  list of wrongful acts. Therefore, the exclusion's first component addresses "any

17  Claim" that "arises out of" those wrongful acts. When it comes to "professional

18  services," however, its relationship to the alleged wrongful acts is described by "in

19  connection with." Thus, Markel's argument about UTA's claim "arising out of"

20  "professional services" is a house built on sand.

21    Markel cites eight cases purportedly in support of its expansive interpretation.

22  However, none of those cases analyzes the breadth of "in connection with." Most of

23  those decisions do not even contain that phrase. Only *Medill v. Westport Ins. Corp.*,

24  143 Cal. App. 4th 819 (2006), gives it more than a mere mention, and that is

25  because the policy at issue defined "'[a]rising out of'" to mean "'based upon, arising

26  out of, or in connection with.'" *Id.* at 826. Markel did not include such a definition

27  in the Policy but even if it had, "in connection with" must mean something different

28  from—and narrower than—"arising out of." As the Ninth Circuit has recognized,

8

"California Court of Appeal cases . . . demonstrate that 'in connection with' would not be given such a broad meaning in the context of a professional services policy exclusion." *Ambrosio*, 606 F. App'x at 887. *See also AIG Prop. Cas. Co. v. Cosby*, 892 F.3d 25, 28-29 (1st Cir. 2018) (Souter, J.) (comparing words an insurer used "side by side" provides an interpretive "key" to ascertain an exclusion's meaning); *Pac. W. Bank v. AIG Specialty Ins. Co.*, 2021 WL 5238578, at *3 (C.D. Cal. Sept. 29, 2021) (different words contained in an exclusion "aid in the interpretation of the [e]xclusion as a whole"); *Pardee Constr. Co. v. Ins. Co. of the W.*, 77 Cal. App. 4th 1340, 1359 (2000), *as modified on denial of reh'g* (Feb. 23, 2000) ("the insurers' failure to use available language expressly excluding [certain coverage] implies a manifested intent not to do so").

In essence, Markel's argument is based on a conflated exclusion that is not in the Policy. But that is not what its Professional Services Exclusion says, and the exclusion must be enforced as written. Courts do "not have the power to create for the parties a contract which they did not make." *Levi Strauss & Co. v. Aetna Cas. & Sur. Co.*, 184 Cal. App. 3d 1479, 1486 (1986), *appeal dismissed, remanded, and ordered published*, 737 P.2d 358 (Cal. 1987). Because Markel's motion is premised on an interpretation that is contrary to the actual language in the Professional Services Exclusion, it must be denied.

## C.   When The Exclusion's Words Are Heeded, Precedent Shows It Does Not Apply

The only case that Markel cites in its entire motion that uses language arguably similar to the Professional Services Exclusion at issue now is *Jamison v. Certain Underwriters*, 599 F. App'x 720 (9th Cir. 2015). *Jamison*, along with its companion *Ambrosio,* illustrates vividly why Markel is wrong.

Both *Jamison* and *Ambrosio* arose from the collapse of a Ponzi scheme involving real estate investments, and both Jamison and Ambrosio were jilted

investors who sued to recover their lost investments.[3] Both cases (along with several others) were settled for a cash payment and an assignment of rights under the schemers' D&O insurance policy, and the investors went after the insurance assets.

The D&O policy's professional services exclusion read:

> Underwriters shall not be liable to make any payment in connection with any Claim . . . for any act, error or omission *in connection with* the performance of any professional services by or on behalf of the Company for the benefit of any other entity or person.

*Ambrosio*, 606 F. App'x at 887 (emphasis added); Appellants Opening Br. at 9, *Jamison v. Certain Underwriters*, No. 12-17412, ECF No. 12-1 (9th Cir. filed Mar. 7, 2013) (emphasis added) ("*Jamison* Br."). In *Jamison*, the alleged wrongful acts were (i) conspiring to operate and operating a Ponzi scheme, (ii) concealment of the scheme and other compromising financial positions when soliciting investments, and (iii) conversion of investment assets. *Jamison* Br. at 7.

By contrast, *Ambrosio* additionally alleged that the schemers had violated securities laws by obtaining an additional unauthorized mortgage on the real estate assets subject to the plaintiffs' investments. *Ambrosio*, 606 F. App'x at 887.

The district court dismissed all the related complaints, including Jamison's and Ambrosio's, citing the professional services exclusion. *Ambrosio v. Certain Underwriters*, 2012 WL 12540015, at *8 (N.D. Cal. Mar. 29, 2012). The district court reasoned that "'in connection with'" "sweeps more broadly than plaintiffs are willing to acknowledge," applying to all conduct in the related actions, even though "it is true that the alleged acts cannot be literally equated with the sale of securities or financial advising." *Id.*

---

[3] *Compare* First Am. Compl., *Jamison v. Certain Underwriters*, No. 11-cv-4958, ECF No. 45 (N.D. Cal.) *with* First Am. Compl., *Ambrosio v. Certain Underwriters*, No. 11-cv-4956, ECF No. 45 (N.D. Cal.).

On appeal, as Markel points out, the Ninth Circuit affirmed as to Jamison's claims. *Jamison*, 599 F. App'x at 721. That makes some sense because the conduct that Jamison challenged concerned the soliciting and handling of the plaintiffs' investments—actions that fall squarely within the professional services that an investment company provides to its investors: to wit, "the sale of securities [and] financial advice."[4] *Ambrosio*, 2012 WL 12540015, at *8.

However, as Markel fails to point out, the Ninth Circuit reversed as to Ambrosio's additional allegations about violations of securities laws for the unauthorized encumbrance of investment property. *Ambrosio*, 606 F. App'x at 887. In doing so, the Ninth Circuit explained that California courts read "in connection with" more narrowly than "arising out of," dispensing with the insurer's argument that the two should be read equally and very broadly—the same argument Markel advances now. *Id.* Because the investment managers' conduct in obtaining an additional mortgage on property did not involve the sale of securities or providing financial advice, that wrongful conduct was not "in connection with" the rendering of professional services, and the exclusion did not apply to Ambrosio's claims. *Id.* Thus, *Jamison*—when read alongside *Ambrosio*—demonstrates the distinction that Markel asks this Court to ignore: while a professional services exclusion may apply to client-facing acts, other acts that "cannot literally be equated with" an insured's professional services do not fall within the exclusion's ambit.

### D.    Markel Cites No Supporting Case Law

None of the cases that Markel cites supports its argument that the exclusion at issue in this case bars coverage for UTA's claims. *See* MSJ at 11-12. *Energy*

---

[4] *Jamison* also alleged "secondary liability" against other persons and entities surrounding the Ponzi schemers for aiding and abetting the scheme. *Jamison* Br. at 6. The Ninth Circuit's opinion—brief as it is—focuses mainly on Jamison's novel arguments that the acts of aiders and abettors, who were not insured under the policy, nevertheless should be covered. Unsurprisingly, the court disagreed. *Jamison*, 599 F. App'x at 721.

11

1   *Insurance Mutual Ltd. v. ACE American Insurance Co.*, 14 Cal. App. 5th 281

2   (2017), addressed the exclusion that Markel seems to wish it had written:

3           'This insurance does not apply to any liability arising out

4           of the providing or failing to provide any services of a

5           professional nature.'

6   *Id.* at 291. That is not the language currently before this Court. In any event, *Energy*

7   did not involve the interpretative rules that govern here. It was an equitable

8   contribution dispute between insurers fighting over who would have to shoulder the

9   cost of a settlement—not a dispute between an insured and its insurer. *Id.* at 289.

10  California courts have long recognized the importance of this distinction:

11          [T]he rules with regard to equitable contribution *among*

12          *insurers* are different from those applicable to the

13          relationship between an insurer and its insured. . . . "'Their

14          respective obligations flow from equitable principles

15          designed to accomplish ultimate justice in the bearing of a

16          specific burden. As these principles do not stem from

17          agreement between the insurers their application is not

18          controlled by the language of their contracts with the

19          respective policy holders.'"

20  *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279, 1306-07

21  (1998) (modification omitted) (quoting *Signal Cos., Inc. v. Harbor Ins. Co.*, 27

22  Cal. 3d 359, 369 (1980)). Accordingly, *Energy* simply does not apply.

23          Markel next cites *HotChalk, Inc. v. Scottsdale Insurance Co.*, 736 F. App'x

24  646 (9th Cir. 2018). *HotChalk* addressed a much broader exclusion that is not before

25  this Court. That exclusion applied to claims

26          'alleging, based upon, arising out of, attributable to,

27          directly or indirectly resulting from, in consequence of, or

28

12

PASICH

1            in any way involving the rendering or failing to render

2            professional services.'

3 *Id.* at 648. The Professional Services Exclusion, which only applies to alleged

4 wrongful acts "in connection with" professional services, is much narrower.

5 Additionally, in *HotChalk*, the insured was a marketing, recruiting, hiring, and

6 enrollment contractor for online university courses. *Id.* at 647. The False Claims Act

7 lawsuit for which it sought coverage arose directly from its enrollment practices that

8 violated federal law. *Id.* Accordingly, the underlying lawsuit clearly and

9 unambiguously satisfied every possible interpretation of the professional services

10 exclusion in that policy. But that is not this case. Here, UTA seeks coverage for

11 claims arising out of the hiring of agents from a competitor agency. Unlike

12 HotChalk, recruiting and hiring are not the services that UTA provides to its clients.

13 *See* SGDMF Nos. 11-12.

14      *Burlington Insurance Co. v. Bay One Security, Inc.*, 2018 WL 1730425 (N.D.

15 Cal. Apr. 10, 2018), is also of no help to Markel. It also dealt with a broader

16 exclusion than the one Markel included in its policy:

17            'This insurance does not apply to "any injury or damage"

18            arising out of the rendering of or failure to render any

19            professional services by or for you.'

20 *Id.* at *2. In *Burlington*, a car dealer contracted with the insured, which was obliged

21 to render nighttime security services. *Id.* at *1. In the middle of the night, a thief

22 broke into the car dealership, wandered around for a while, stole a BMW, and

23 crashed it before Bay One's security guard did anything. *Id.* at *1-*2. The car dealer

24 sued Bay One, and in the resulting coverage action, the court unsurprisingly found

25 that the claim "ar[ose] out of the . . . failure to render" "professional services." *Id.*

26 at *2. That uncontroversial finding sheds no light on the present case because the

27 CAA Lawsuit resulted from circumstances that were not the provision of

28 professional services to UTA's clientele.

1       Markel's last authority is an apt summary of all the defects described above

2   (and more). *Beazley Insurance Co., Inc. v. ACE American Insurance Co.*, 880 F.3d

3   64 (2d Cir. 2018), was decided under New York law, and Markel does not attempt

4   to discuss how that New York insurance law relates to California law, which

5   governs this case. *Beazley* also involved the same broadly worded professional

6   services exclusion that Markel wishes it had included, but did not, addressing claims

7   "alleging, based upon, arising out of, or attributable to the rendering or failure to

8   render professional services." *Id.* at 67. The *Beazley* court also found that the

9   parties that brought the underlying cases were the insured's "customers," which put

10  the underlying cases squarely within the professional services exclusion, based on

11  that exclusion's wording. *Id.* at 69-70. Again, that is not the case here because the

12  CAA Lawsuit was initiated by UTA's competitor (not a "customer"). Additionally,

13  *Beazley* was a case among insurers, sounding in equity, and did not necessarily

14  address insurance contracts in the same manner as is proper in a case between an

15  insured and insurer.

16      In all, Markel (i) admits that professional services were not provided in the

17  circumstances leading to the CAA Lawsuit, (ii) asks this Court to turn a blind eye to

18  the words that Markel chose in drafting its Professional Services Exclusion,

19  (iii) cites only part of *Jamison* when *Jamison* and *Ambrosio*, when read together,

20  show Markel is wrong, and (iv) cites no authority that supports its interpretation of

21  the exclusion that it actually wrote. Markel does not carry its burden as to the

22  Professional Services Exclusion. Its motion should be denied.

23  **IV.   California Insurance Code Section 533 Does Not Bar Coverage**

24      Markel argues that "the Underlying Litigation is also uninsurable as a matter

25  of law pursuant to California Insurance Code Section 533" because "[t]here is

26  simply no way to read the [underlying] Complaint as alleging anything other than a

27  willful scheme by UTA and its co-conspirators to harm CAA and enrich themselves

28  by stealing CAA's agents and clients in contravention of contracts, duties, and

14

PASICH

laws." MSJ at 15. Markel further argues, "There is no way for such claims to sound or for liability to attach in negligence," "all of the alleged breaches of duty and contract are intentional," and all the torts "are intentional" or "require knowledge of and intentional assistance to the willful wrongdoing." *Id.* at 15-16. Rather than explaining why any of these assertions has any basis in law, Markel just says that "the Court can see for itself." *Id.* This is not sufficient to carry Markel's burden on summary judgment, and it is an incorrect statement of established California law regarding section 533.

In UTA's own motion for partial summary judgment, UTA described in detail why section 533 does not bar coverage in this case. ECF No. 36-1 at 19-26. As UTA explained there, there are four reasons why Markel is wrong. First, section 533 does not apply to the duty to pay defense costs; it only bars indemnifying intentional acts that were committed to cause harm. *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 277 (1966); *Downey Venture v. LMI Ins. Co.*, 66 Cal. App. 4th 478, 507, 509 (1998); *B & E Convalescent Ctr. v. State Comp. Ins. Fund*, 8 Cal. App. 4th 78, 93, 101 (1992); *accord St. Paul Fire & Marine Ins. Co. v. Weiner*, 606 F.2d 864, 870 (9th Cir. 1979).

Second, the CAA Lawsuit alleged causes of action that do not require proof of willful conduct to establish liability. Section 533 does not preclude an insurer's duty to defend or its duty to indemnify unless the plaintiff, "in order to prevail on his cause of action, would be required to show both an intentional act . . . and a *specific intent* to injure." *B & E*, 8 Cal. App. 4th at 94. The CAA Lawsuit alleged claims for breach of fiduciary duty, breach of the duty of loyalty, aiding and abetting breaches of those duties, violations of California's Unfair Competition Law, breach of contract, and breach of the implied covenant of good faith and fair dealing. *See*

SGDMF No. 3. None of these causes of action requires specific intent to injure in order to establish liability, so section 533 does not bar coverage for those claims.[5]

Third, section 533 does not bar coverage for an institution like UTA unless its board of directors level management approved or ratified the allegedly willfully injurious conduct. *Dart Indus., Inc. v. Liberty Mut. Ins. Co.*, 484 F.2d 1295, 1296-99 (9th Cir. 1973); *Downey*, 66 Cal. App. 4th at 512; *Lujan v. Gordon*, 70 Cal. App. 3d 260, 262 (1977). Because Markel has not established any action taken by UTA's governing body to approve or ratify the conduct challenged in the CAA Lawsuit, section 533 does not preclude insurance coverage for UTA's losses.

Fourth, the Policy provides that acts that fall within section 533's ambit are excluded from coverage *only* "if a final and non-appealable adjudication adverse to [an] Insured . . . establishes such a deliberately fraudulent act or omission or willful violation." SGDMF No. 14. Of course, the CAA Lawsuit ended in a settlement and without any adjudication on the merits, so by the Policy's own terms, Markel cannot escape its obligations by resorting to section 533. *See Exec. Risk Specialty Ins. Co. v. Rutter Hobbs & Davidoff Inc.*, 2012 WL 12878754, at *7 (C.D. Cal. Sept. 12, 2012) (section 533 and exclusion similar to Markel's did not apply prior to a final judgment showing intent).

Markel cites just two cases in arguing that section 533 should bar coverage. Neither establishes Markel is entitled to summary judgment—quite the opposite. Markel cites *Downey* for the proposition that "inherently harmful willful acts are uninsurable pursuant to California Insurance Code Section 533, and, to prevent disguised illegal indemnity, [an] insurer is prohibited from paying even a cost-of-defense settlement in such cases." MSJ at 15. Even if this curt summary of a seminal

---

[5] *See Mosier v. S. Cal. Physicians Ins. Exch.*, 63 Cal. App. 4th 1022, 1044 (1998) (breach of fiduciary duty); *Lippitt v. Raymond James Fin. Servs., Inc.*, 340 F.3d 1033, 1043 (9th Cir. 2003) (section 17200); *Hamilton v. Greenwich Investors XXVI, LLC*, 195 Cal. App. 4th 1602, 1614 (2011) (breach of contract).

1   insurance coverage case were correct, it does nothing to address the substantial case

2   law—including from the California Supreme Court and Ninth Circuit, on the books

3   since the 1960s and 70s—holding that defense costs are insurable notwithstanding

4   section 533. For this reason alone, Markel's motion should be denied. But Markel

5   also failed to establish that it could avoid paying for defense costs without an

6   adjudication showing that section 533 applied, as its Policy requires.

7       Markel also relies on *State Farm General Insurance Co. v. Mintarsih*, 175

8   Cal. App. 4th 274 (2009), stating "less than willful conduct that is inextricably

9   intertwined with a scheme of willful misconduct is also uninsurable." MSJ at 15.

10  Again, this does not address the payment of defense costs or the Policy's

11  requirement that payments of defense costs must continue until an adjudication on

12  the merits demonstrates a willfulness that renders the acts uninsurable.

13      Moreover, *Mintarsih*'s conscience-shocking facts are so far afield from the

14  business dispute in the CAA Lawsuit that it cannot guide the Court now. In that

15  case, the insureds were accused of enslaving a domestic employee for seven years.

16  175 Cal. App. 4th at 280. It is not a case where economic competitors vied for

17  profits in a zero-sum market, as was the nature of the CAA Lawsuit. The willful

18  wrongdoing that the *Mintarsih* court found polluted every cause of action in that

19  case is not of the same nature as the present case. For instance, the CAA Lawsuit

20  alleged breach of contract (*see* SGDMF No. 3), and a party alleging a breach of

21  contract (without more) is only entitled to compensatory damages, not punitive

22  damages, regardless of the circumstances surrounding that breach. Cal. Civ. Code

23  § 3294. In any event, Markel does not try to explain how enslavement might

24  correspond to the allegations in the CAA Lawsuit. On the contrary, binding

25  precedent holds that when a cause of action does not require a finding of specific

26  intent, section 533 does not bar payment of defense costs. *B & E*, 8 Cal. App. 4th at

27  94.

28

**OPPOSITION TO MARKEL'S MOTION FOR SUMMARY JUDGMENT**

1    Markel's own authorities contradict Markel's position. In *Unified Western*

2    *Grocers, Inc. v. Twin City Fire Insurance Co.*, 457 F.3d 1106, 1113-14 (9th Cir.

3    2006), the Ninth Circuit held that section 533 does not bar claims for breaches of

4    fiduciary duties, which were alleged in the CAA Lawsuit. In *Unified*, the insurer

5    made the same argument that Markel advances now: the allegedly willful acts were

6    "inseparably intertwined" from the causes of action that did not require scienter to

7    impose liability. *Id.* at 1114. *Unified* dealt with allegations that were far worse than

8    those alleged in the CAA Lawsuit: a scheme to defraud creditors, not simply a

9    scheme to change employers. *Id.* And still, the Ninth Circuit refused to let the

10   insurer off the hook, holding, "The damages alleged in the Underlying Complaint do

11   not unavoidably originate from intentional and willful conduct by the insured," and,

12   "The presence of allegations in the Underlying Complaint that assert a broader

13   scheme to defraud creditors does not automatically subsume all allegations of a

14   negligent character into the sphere of willful conduct." *Id.*

15       Markel's arguments are not only insufficient to carry its burden on summary

16   judgment, but they are contradicted by overwhelming authorities dating back

17   decades.

18   **V.   <u>"Restitution"—In the Insurance Sense—Is Not at Issue Here</u>**

19       Markel next argues that "the only monetary relief sought (apart from

20   unspecified damages caused by UTA's willful scheme . . . ) is

21   restitution/disgorgement of ill-gotten gains, which is uninsurable under California

22   law no matter how labeled." MSJ at 16. Of course, this "apart from" clause is an

23   admission that more than restitution and disgorgement were at issue in the CAA

24   Lawsuit. Once again, Markel's own argument belies its baselessness.

25       But even accepting Markel's telltale carve-out, "restitution" has a particular

26   meaning in the context of insurance that should not be confused with other broader

27   uses of the word to describe an award of money. ""Restitution" is an ambiguous

28   term, sometimes referring to the disgorging of something which has been taken *and*

18

1   *at times referring to compensation for injury done*.'" *People ex rel. Kennedy v.*

2   *Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102, 134 (2003), *as modified on denial of*

3   *reh'g* (Sept. 9, 2003) (quoting John D. Calamari & Joseph M. Perillo, *The Law of*

4   *Contracts* § 9-23 at 376 (3d ed. 1987) ("Often, the result under either meaning of the

5   term would be the same")) (emphasis added).

6        In *AIU Insurance Co. v. Superior Court*, 51 Cal. 3d 807 (1990), the California

7   Supreme Court specifically limited the definition of uninsurable "restitution" to

8   forms of relief that are far narrower than what CAA sought through the CAA

9   Lawsuit. In *AIU*, the insured faced liability for environmental contamination and

10   was ordered to reimburse government agencies for the costs incurred in the

11   subsequent cleanup. *Id.* at 815. Undertaking a nationwide survey of cases, the

12   California Supreme Court refused to institute a regime that "would unreasonably

13   make coverage hinge on the 'mere fortuity' of which recovery mechanism

14   (injunction, reimbursement, or 'damages to natural resources') the government

15   selects in enforcing CERCLA." *Id.* at 819 (noting that "only one state appellate

16   decision, in dictum, reache[d] the opposite conclusion"). Thus, the California

17   Supreme Court held that reimbursement of government agencies' response costs "is

18   restitutive in that it attempts to restore to the agencies the value of a benefit

19   constructively conferred on [the insured], . . . [but it] is not restitutive in the narrow

20   sense . . . as inappropriate for insurance coverage." *Id.* at 836. It then concluded the

21   reimbursement was "damages" within the terms of the insurance policies. *Id.* at 837.

22   Thus, when the cause of action seeks repayment because of harm, it does not matter

23   if the theory of recovery is restitutive in nature for insurance purposes.

24        *Bank of the West v. Superior Court*, 2 Cal. 4th 1254 (1992), which Markel

25   cites, is an illustration of what "restitution" means in an insurance context—and it

26   does not apply to the relief CAA sought in the CAA Lawsuit. In *Bank*, the bank

27   faced consumer class actions that claimed that the bank had overcharged them with

28   hidden fees, exorbitant fees, and penalties. 2 Cal. 4th at 1258-59. In other words, the

19

PASICH

underlying plaintiffs claimed that the bank had taken money *directly from them*, and through their class action, they were *trying to get that money back*. That is a different sense of "restitution" than what was at issue in the CAA Lawsuit. In our case, CAA never gave anything to UTA; its theory of recovery was that it was damaged because the profits generated by the departing agents would benefit UTA, rather than CAA.

None of the cases that Markel lists in its string citation to support its argument suggests that CAA claimed uninsurable relief. For instance, in *Pan Pacific Retail Properties, Inc. v. Gulf Insurance Co*., the Ninth Circuit reversed the district court's finding that the settlement of derivative and direct claims against corporate directors were uninsurable restitution because it was conceivable that the settlement also encompassed "compensation for the individualized harm of the shareholders and not for the return of money wrongfully withheld by Appellants." 471 F.3d 961, 969 (9th Cir. 2006). That court stated the rule in California as, "The insurance companies here were required to cover claims that sought compensation for a loss, even if the loss to the victim could also be construed as an ill-gotten benefit to the insured." *Id.* at 966. Yet, that is the opposite of what Markel encourages the Court to hold now. CAA's claim for "restitution" was that it lost future earnings when it lost agents. Even if it characterized that lost expectancy as UTA's ill-gotten gains, Markel is not relieved of its obligations by calling CAA's claims restitutive.

*Unified* similarly provides no support for Markel's position. In *Unified*, the Ninth Circuit reversed the insurer's win on summary judgment because a question of fact existed as to whether the money at issue in the underlying dispute amounted to uninsurable restitution, or also included damages "in an amount greater than the amount of money actually alleged to have been taken by the Defendants." 457 F.3d at 1115-16. Again, CAA did not allege that UTA took money from it. The entirety of CAA's claimed loss was over and above the $0.00 that UTA received from CAA.

OPPOSITION TO MARKEL'S MOTION FOR SUMMARY JUDGMENT

1    Neither *Pan* nor *Unified* addresses whether lost profits or lost market share—

2  like those sought by CAA—are uninsurable in California, and the undersigned is

3  aware of no such decision. On the contrary, in a matter of first impression, the

4  California Court of Appeal recently held in the context of California's Unfair

5  Competition Law (which only permits restitution to consumers, not damages), "Lost

6  profits are damages, not restitution . . . ." *Lee v. Luxottica Retail N. Am., Inc.*, 65

7  Cal. App. 5th 793, 797 (2021). "Simply put, . . . a plaintiff cannot recover

8  anticipated but unearned, future income . . . in the guise of restitution because,

9  absent a legally enforceable right to that stream of future income, the plaintiff lacks

10  an ownership interest in it and thus there is nothing to 'restore.'" *Id.* at 807.

11    There is no reason why that rationale would result in a different conclusion

12  now when considering the insurability of CAA's claim for lost profits. *See Jaffe v.*

13  *Cranford Ins. Co.*, 168 Cal. App. 3d 930, 935 (1985) ("Although the concept of

14  'restitution' may have a broader meaning in other contexts," a money award is

15  uninsurable only when "[t]he defendant is asked to return something he wrongfully

16  received," not when "he is . . . asked to compensate the plaintiff for injury suffered

17  as a result of his conduct"). The general rule is that decrease in income as a result of

18  competitive behavior is an economic injury that can be remedied by the payment of

19  money damages. *See United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp.*,

20  2012 WL 3861946, at *8 (S.D. Cal. Sept. 5, 2012) (denying motion for permanent

21  injunction and collecting cases). At the very least, this shows that UTA reasonably

22  expected that CAA's claims for lost profits would be covered, an expectation that

23  must guide this Court. *AIU*, 51 Cal. 3d at 830.[6]

24

25

26

27  ───────────────
[6] It is unclear what Markel intended to argue when it cited the remaining cases on
the issue of restitution or disgorgement, MSJ at 16, but it is Markel's burden to
28  show its entitlement to summary judgment. This string citation falls well short.

21

PASICH

## VI.   UTA's Bad Faith Claim Should Move Forward

Markel argues that it is entitled to summary judgment on UTA's cause of action for breach of the implied covenant of good faith and fair dealing because it is entitled to summary judgment on UTA's breach of contract claims. MSJ at 17. As discussed above, that is not true, so that argument fails.

The argument also fails because an insurer's obligation to act reasonably and in good faith "'is *independent* of the contract and attaches over and above the terms of the contract.'" *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 578 (1973) (in bank) (quoting *Jones v. Kelly*, 208 Cal. 251, 255 (1929)). While unreasonably denying insurance benefits is perhaps the clearest and most common set of circumstances underpinning bad faith claims, an insurer also acts in bad faith when it fails to act reasonably in processing and handling a claim. *Id.*; *see also Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 819 (1979) (failing to reasonably investigate a claim is bad faith); *Richardson v. Emp'rs Liab. Assurance Co.*, 25 Cal. App. 3d 232, 245 (1972) (an insurer acts in bad faith when it knows there is coverage but denies the claim anyway). "The insurer may not just focus on those facts which justify denial of the claim" because, "denial of a claim on a basis unfounded in the facts known to the insurer, or contradicted by those facts, may be deemed unreasonable." *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 721 (2007).

Here, there are facts that tend to show that Markel acted in bad faith when it handled UTA's claim for coverage. For instance, under California law, an insurer acts unfairly and unreasonably when it fails to state promptly all factual and legal bases for its denial of a claim. Cal. Ins. Code § 790.03(h)(13). Indeed, the insurer must do so within 40 days of receiving notice of a claim. 10 Cal. Regs. Code § 2695.7(b). Markel, however, denied coverage for UTA's claim by letter dated April 16, 2015. In that letter, Markel made no mention of Insurance Code section 533, even though it had been fully apprised of the nature of CAA's claims against UTA and its employees. SGDMF No. 10. The first time that Markel's purported

defense relying on that statute surfaced was in subsequent correspondence between legal counsel 544 days later, in a letter dated October 11, 2016. SGDMF No. 13. Asserting a new defense long after Markel was required to provide "all bases for [its] rejection or denial and the factual and legal bases for each reason given for such rejection or denial which is then within the insurer's knowledge" (10 Cal. Regs. Code § 2695.7(b)(1)) is evidence of bad faith sufficient to overcome Markel's motion for summary judgment as to this cause of action. *See Reid v. Mercury Ins. Co.*, 220 Cal. App. 4th 262, 275-76 (2013) (reversing grant of summary judgment because violations of fair claims settlement laws can be evidence of bad faith, even though there is no private right of action to enforce those laws).

Markel further argues that "there was at most a genuine dispute as to the law regarding which MAIC's position is at the very least reasonable . . . ." MSJ at 17. However, "[i]t is doubtful that the so-called 'genuine dispute doctrine' applies in third party duty to defend cases." *Mt. Hawley Ins. Co. v. Lopez*, 215 Cal. App. 4th 1385, 1424 (2013); *Howard v. Am. Nat'l Fire Ins. Co.*, 187 Cal. App. 4th 498, 530 (2010) ("It has never been held that an insurer in a third party case may rely on a genuine dispute over coverage to refuse settlement."). And, regardless of Markel's beliefs, there is evidence that contradicts its position that it acted appropriately. Indeed, Markel's interpretation of the Professional Services Exclusion and reliance on section 533 are patently unreasonable, unjustified, and contrary under the customs, standards, and practices in the insurance industry. *See* SGDMF Nos. 6-8.

Taken in their totality, the fact that Markel failed to raise section 533 timely, the fact that it was raised post-denial by counsel, and the fact that an expert in claims handling and insurer conduct is of the opinion that reliance on the Professional Services Exclusion and section 533 contravene basic industry customs, standards, and practices tend to show that Markel has erected unreasonable obstacles to coverage, rather than performing a good faith attempt to honor its promises of coverage by seeking out all possible bases to support UTA's claim—as is its duty.

*Wilson*, 42 Cal. 4th at 721. These circumstances demonstrate that there is a genuine issue of material facts as to UTA's cause of action for breach of the implied covenant of good faith and fair dealing. *Shade*, 78 Cal. App. 4th at 915 ("a shifting position with respect to coverage might strengthen an inference of bad faith"). Markel's motion must be denied. *See Reid*, 220 Cal. App. 4th at 275-76.

## VII.   Markel Fails to Address UTA's Declaratory Relief Claim

Markel does not address UTA's third cause of action for declaratory relief, and accordingly, it has failed to carry its burden to show it is entitled to summary judgment as to this cause of action.

## VIII.   Markel Fails to Address UTA's Claims for Coverage for the Underlying Arbitrations

"MAIC's Motion for Summary Judgment is based solely and entirely on the contents of two documents . . . : (1) the Policy . . . ; and, (2) the operative Underlying Litigation Second Amended Complaint . . . ." MSJ at 7. While these documents are integral to UTA's claims for coverage, they are not comprehensive. UTA did not claim coverage solely for the case that CAA filed in the Los Angeles Superior Court; it also claimed coverage for three arbitrations against UTA employees. SGDMF No. 9. Because Markel does not address the arbitrations at all, it presents no evidence or argument whatsoever to support its claim for summary judgment as to these central components of UTA's claim.

Additionally, although CAA's Second Amended Complaint is important to Markel's ongoing duties to evaluate the potential for coverage, *see Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993), that pleading was filed *after* Markel denied coverage. SGDMF Nos. 10, 15. Therefore, the Second Amended Complaint cannot serve as the evidentiary totality of Markel's duties under the Policy or its reasonableness in considering and handling UTA's claim for coverage. Failing to carry its burden, Markel's motion must be denied.

PASICH

## IX.   <u>Conclusion</u>

Markel does not carry its burden as to any aspect of its claimed entitlement to summary judgment. Its arguments about the Professional Services Exclusion are unfaithful to the law and to the exclusion's plain language (and to a reasonable interpretation of that language). Its reasoning about section 533 sidesteps decades of case law to the contrary. Its attempt to avoid bad faith liability also is contradicted by competent evidence. And Markel failed to address large portions of UTA's claim for insurance coverage, as well as an entire cause of action alleged in the complaint. For all these reasons, Markel's motion should be denied.

DATED: November 22, 2021           PASICH LLP

By:*/s/ Michael S. Gehrt*
           Michael S. Gehrt
           Attorneys for Plaintiff

OPPOSITION TO MARKEL'S MOTION FOR SUMMARY JUDGMENT